Mr. Freed, are you ready? Thank you, Your Honor. Please, the Court. At the core of this appeal is whether the Freed's otherwise practiced losing settlement agreement invokes a freestanding promise not to infringe, or whether it's part of a promise not to use ZX circuitry to infringe. Because if it's part of a promise, a freestanding promise not to infringe, this is an easy decision for you because the jury has already decided that they infringe. That's a given fact. They infringed with this product, and if they had a freestanding promise not to infringe, they breached the contract. Okay, so let's turn to the central argument, as I understand it, in your brief. Is it your argument that Section 3.3 contains a blanket promise to not practice the assertive claims? Does that argument depend entirely on extrinsic evidence, or are you arguing about what the language says? Both. We're arguing what the language says and the extrinsic evidence supports it, and the fact that you have to look at the extrinsic evidence in order to make that determination. Yes, but looking at the language itself, from a plain English standpoint, doesn't the otherwise practice the assertive claims language in 3.3 depend on the phrase ZX circuitry identified by counsel in Linear in the ITC proceeding? No, Your Honor, and the reason it can't, there's two reasons that it can't. One is that the 2 doesn't go with the otherwise practice. It goes with the things that you're not supposed to do with the ZX circuitry. Number one, you're not supposed to use it to practice sleep mode. You're not supposed to use it to practice reverse current protection. But the 2 has nothing to do with the otherwise practice. Listen, there's no doubt about this. We admit, and everybody acknowledges, that this agreement is not an exemplar of great drafting. But, okay, do you at least agree that the best plain English reading of this section ties the ZX circuitry phrase to the final phrase of the paragraph? No, I do not, Your Honor, because they have the exact same problem with the 2 that we have with the will not. If you diagram the sentences, we used to do when we were, I guess, in 7th grade, and I've done this, the diagram comes out about this big, that's why I didn't even put it in the brief. But if you diagram this sentence, they have the exact problem. You can't get the direct objects and the indirect objects to match perfectly. They have to put an extra 2 in, and we have to put the will not with the otherwise practice. And that's why the extrinsic evidence is extremely important. So it will allow such products to, and then it has two different things that they can do, or otherwise practice the assertion. There's a comma before the otherwise practice, Your Honor. And that's a comma that you can't ignore. That's why the extrinsic evidence is incredibly important here. Wait, so the comma means that when we're reading this, I mean, usually you're supposed to use commas in basic grammar, right, to set off three different things, which is what they're doing in this sentence. But you're saying the comma read means that the final phrase is set up for everything that precedes it? No. If you had a single 2 with that comma, my argument would be different. I'm sorry, I didn't hear you. A single word 2, and with the… Word 2 otherwise practice the assertive claim. Yeah. Then it would be… Then we would have the reading that they want to make. Would your argument be different if the word otherwise was not in that last clause? Oh, if the word otherwise was not in the last clause, I would have no argument, because that's the whole purpose of this, was to get that freestanding. The word otherwise was put there to get the freestanding promise not to infringe into the agreement. The otherwise is crucial to this. It has to be there. And it carries the weight of this appeal. Now, I have a secondary argument that I'd like to address, that even if it requires only ZX circuitry to infringe, to violate the agreement, I think we still should prevail on this. But the first agreement… California law, which is what has to be applied here, has a very liberal parole evidence rule on this kind of topic. You must take into account the parole evidence in determining in the first instance the meaning of the agreement. Right, but even under California's very liberal rule, which says you can do it right from the beginning, you still go back to the notion that parole evidence can't be used to change the meaning of the term. But to inform the meaning of the term. To inform the meaning of the term is fine, and it makes sense, because it makes life easier, because you can just consider everything. And here's what… I mean, didn't the Judge Sleepier say that that's the problem, that even if I look at all this other stuff, in order to get to where you want to be, I have to rewrite the sentence? Had he done that, Your Honor, we would have had a different case. What he did was merely acknowledge the existence of parole evidence and said, you know, I'm not going to pay any attention to that. He never evaluated it at all. Had he evaluated it, he would have had to address this critical point, and this is extremely critical. The agreement spells out two things you can't do with ZX circuitry. You can't use ZX circuitry to practice sleep mode. You can't use ZX circuitry to practice reverse current protection. His reading assumes that there's yet a third way to practice the claims of the patent that would otherwise practice it with ZX circuitry. But their own expert, and we have this, I mean, it's absolutely clear in our brief on page 8 of our gray brief. Their own expert admits there's only two ways to practice these claims. If you look at that quote from paragraph 111 of his report, he says flat out, these claims break down. The asserted claims break down into two categories. Sleep mode claims and reverse current protection claims. There is no third category. So this extrinsic evidence precludes, not only renders our proposal reasonable, but it renders it the only one you can have. You can't have another one. There is no other way to practice these claims. They only can be infringed by reverse current protection or by sleep mode. So this empty set is what the judge below interpreted because he thought it's been plain English. He interpreted the agreement as containing an empty set. It can't be interpreted that way. And this, there's further evidence on this point, your honors, is that their chief negotiator flat out admitted in deposition that they had this independent promise not to infringe. He said, yes, we agreed not to infringe those claims. That's on page 15 of our gray brief. Did he specifically note that he was referencing to the ZX circuitry when he made that statement? No, your honor. In fact, what happened was during the deposition, it was clear that he made no qualification like that whatsoever. He went back and through the vehicle of a so-called errata, his real testimony is on the left of the two columns on page 15 of the gray brief. In an errata, they changed it. They stood the testimony on its head. He adopted the party line. Now, one of the cases we cited says you can't do that. There's things you could do with an errata, but you can't turn a deposition into a take-home exam. And that's what he did. He made it say the exact opposite of what it said. He was asked this question. There was no limitation of this on whether it was ZX circuitry or not. The question was, did you agree not to do this? And he said, yeah, we agreed it. Those were the claims. We agreed not to practice them. And then they said they had him change on the errata sheet to change it back to, oh, we agreed not to do it with ZX circuitry. So we have two absolutely probative and controlling pieces of extrinsic evidence. Plus we have, I think, at least as plausible a position on the grammar because, again, I'm not… You don't really respond much to the extrinsic evidence that your friend on the other side implies as well. I mean, what their argument is is that even to the extent you're looking at extrinsic evidence, it's contradictory. And the language really should control. Your Honor, we did respond to that. The evidence that they pointed to which they said was contradictory had nothing to do, and we addressed that in our great brief as well, had nothing to do with this particular paragraph of the agreement, and it had nothing to do with this particular testimony. It was at least as consistent with the testimony of linear's witnesses as it was with the lawyer's positions that there was only a promise not to use the ZX circuitry. So we did respond to their argument that this extrinsic evidence was confusing. It's not on this issue. It was never confusing on this issue. So tell me what, or otherwise practically asserted claims anywhere in the world, what do you think that modifies? It's the object of will not. It's one of the other objects of will not. It comes very late, but it's one of the other objects. So you agree that it is not made and will not make, and you're saying that we have to take the will not out of the has not made? Will not goes with both will not make and will not otherwise practice is what I'm saying. Even though right before the will not make is the clause has not made? Yeah, I agree that that's what happened. But the agreement got drafted. Remember how the agreement got drafted, Your Honor. The agreement got drafted. Can you just finish responding to Judge O'Malley's questions? I just want to hear. I mean, are you all in agreement then? I'm in agreement that it follows. It has not made and will not make? I'm agreeing with Judge O'Malley that I would be pulling the will not out of the middle of that and making it go with both. What follows directly after it, even though the has not made precedes it, but I would be making the will not go with both what follows after it and with the otherwise infringed. And the reason I would be doing that is because when this agreement was drafted, it was originally drafted with just references to sleep mode. So when Linear got around to it, they said this is just not good enough. We're not going to settle on this basis. You have to put in not just sleep mode. You have to put in reverse current protection, and you have to just not practice the claims. That's it. So they put both in together. And when they lumped them in together, they didn't do it in the most artful way, and there's no question about that. But I maintain, Your Honor, that the grammar of this sentence is equally weak when you apply it to the otherwise practice. But yet and still, even so, the instrument of evidence rule and the way California applies it, I think is absolutely control-inherent, has to be, for the very simple reason that this agreement has now been interpreted as having an empty set. It's rendered those words a nullity because there's no way to do it. You make an alternative argument in your brief that I thought you seemed to give up on at trial, and that is the argument that even if the judge was correct with respect to the reading of this contract, that the new product does practice. The ZX circuitry identified by Counsel for Linear in the ITC proceeding. That's correct, Your Honor. I don't think we gave that up at trial. I mean, we were precluded from presenting that to the jury. We were jam-walled out of that. Well, but you conceded that there were 40 different components in the new product. Oh, that's absolutely. But my point was ZX circuitry is not a transistor-level interrogation. It can't be. And again, the agreement itself is the best evidence of the fact that ZX circuitry does not describe one set of transistors. You know how I know this? The agreement tells us this. The agreement says that there's ZX circuitry that you're not going to do, but by the way, there's this other ZX circuitry in this other product. I think it's the 2104. So the agreement says in the 2104, you can use that where the ZX circuitry is not connected. It's just there, but it's not connected. Well, guess what? The evidence is plain that the ZX circuitry in the 2104, where it's not connected, and the ZX circuitry in the other stuff are not transistor-level identical. They're similar, but they're not transistor-level identical. So the agreement on space makes it plain that this is not a transistor-level evaluation. ZX circuitry, the agreement says, is a functional thing. It's whether or not it's going to do sleep mode. It's whether or not it's going to do reverse current protection, not whether or not it's at transistor-level. The claims themselves don't contain this language that you say is the only way that you can infringe the claims, right? They don't contain the words sleep mode. They don't contain the words reverse current protection. That's correct. I believe that's correct. But everybody said that that's what their effect is, including their own. But that's what we're in total agreement on. So why wouldn't it make sense that otherwise practically asserted claims would be a catch-all with respect to that limited kind of circuitry? It is. It's a catch-all with respect to how you accomplish sleep mode and reverse current protection. It's not a catch-all to the fact that you have to use ZX circuitry. Why didn't you just have a separate sentence? That was one of their arguments, and there's a good answer to that. This was a settlement of an IPC proceeding. This agreement could have said don't practice the invention. But it was being done in the context of a consent judgment and a consent order presented to the ITC. Classically, in those instances, and actually in district court litigation too, you always not just throw in the catch-all, don't infringe, but you point out what the infringing product is. And that's what this agreement did. It laid out that by name, the products that were being kicked out by function of what they did, and then it put the catch-all in there. That's not uncommon. The fact that the catch-all is there is not. So I think I'm into my rebuttal time. But before I do that, I want to- I think Judge Raynard may have a question. Yes. You are into your rebuttal time, but I wanted to hear something real quickly on the attorney's fees issue. That's what I was going to go to. Thank you, Your Honor. Very quickly on the attorney's fees issue. It's a very simple point. They gave up by contract their right to challenge validity in any contract action between the parties. They retained the right to do it in infringement litigation. But they gave up their right to do it in contract litigation. It's a specific clause in the agreement. There's no doubt about it. Once they gave- You brought an infringement claim.  You brought an infringement claim. That's correct, Your Honor. And they were entitled to raise validity, and they did raise validity in the infringement part of the case. And they lost it, and they haven't even gave it up on appeal. Well, now they want the fees for that in the contract action. Having given up the right to contest validity in the contract action, they should not be allowed to have fees for it in the contract action. Isn't your infringement theory based on a contractual clause? Pardon? Isn't your infringement theory based on a contractual clause? No, my contractual theory is based upon an infringement theory. My infringement theory is not based on contractual clause. My infringement- Didn't the judge account for that by cutting their fees in half? Well, that's what they say he did, but he didn't say he did that, number one. And the point is, these were enormous fees. They put their case behind validity. They mounted an amazing invalidity attack. And the fees are clearly there. They're clearly separable. And what he did was say, well, you've prevailed on certain things. We'll cut everything in half. But that shouldn't have even been in the base in the first place, because they gave up their contractual right to have that in the base. They gave up their right to fees. And in California law, or in the common issue rule, is that you could collect fees that are inseparable when you're in one of these situations, if they're inseparable from a claim where they would be proper in the first place. Fees are not proper in the first place. In view that fees were awarded below, should we award fees on this appeal? I really haven't looked at that. But I think the contract is susceptible of that interpretation, that part of the fees recoverable under the contract would be fees associated with the appeal. They wouldn't be for the appeal, but they would be contract damages, I guess. They could be. All right. Well, you're well over your rebuttal time. Yes, for which I apologize. You have before two minutes of rebuttal, and therefore we're giving you an extra three minutes in total. So we'll increase Mr. Bagatelle's time by that three minutes, if he needs it. Great. Randy here, please. May it please the Court, Dan Bagatelle on behalf of Monolithic Power Systems. The fundamental problem with Collinear's position on this appeal is that the contract is not reasonably susceptible to Collinear's reading. It is a written contract, not an oral contract. California does have a liberal rule that allows the court to consider expensive evidence in order to reveal a latent ambiguity in the written agreement. But you're still interpreting the language of the written agreement. You don't get to go to the jury based on an ambiguity in the parole evidence. You only get to go to the jury based on... The language is difficult to follow. I mean, like your opposing counsel, I kind of was haunted by Sister Mary Clare up at the board, you know, diagramming all these sentences. So why don't you tell us, you believe the or otherwise practice modifies what? Well, the or otherwise practice, the assertive claims anywhere in the world refers back to such products. And such products are products in which the ZX circuitry identified by counsel for Linear and the ITC proceeding are connected. And... What is your response to counsel's argument that that additional comma after the word reverse polarity protection changes that? Well, we've all taken grammar and some people use serial commas and some people don't. In fact, the word otherwise confirms that the otherwise is another way that's related to the previous words. Reverse polarity prevention protection, excuse me, in sleep mode. All three of which are related to such products entering into. And those products are the products with the ZX circuitry. All three of those were a related promise. As you pointed out, Judge O'Malley, he's trying to do radical surgery to get to the construction they want. They want to rip out, will not, from the phrase, has not made and will not make any sales. Skip 43 words forward, ignore everything about the ZX circuitry and pick up otherwise practice, the assertive claims. Do you agree with him that in order to get to your reading that you would have to insert another two in front of the word otherwise? No, the word two applies to enter into what linear referred to as sleep mode and to otherwise practice the assertive claims. You don't need another two. It refers to all of them. The word that's missing there is the word or between sleep mode and reverse polarity protection. But that's a problem for both parties interpretations. And it's irrelevant to the case because nobody's arguing that MPS was not forbidden from practicing using the ZX circuitry to practice reverse polarity protection. There's really no ambiguity about the issue on which linear is raising. They say otherwise. There is no otherwise. But the word in the agreement is otherwise. And that means another way other than just listed. Couldn't the otherwise also go to refer to what defines sleep mode in order so that there's no dispute as to what sleep mode means? Exactly right. Lawyers are paid to be paranoid. And in this case, the words sleep mode and reverse polarity protection were in quotation marks. They were the words that were used by linear's expert in the ITC proceeding. MPS's expert didn't use those terms. You can actually look at page 15 of the reply brief. They used different terminology. A good lawyer is going to say, I don't really want to get into a semantic debate over what sleep mode means or what reverse polarity protection means. Those aren't words in the claim. So I'm going to include a catch-all that covers other ways of using the ZX circuitry to practice the claims. That's exactly what it says there. I'd ask your honors to look at three other portions of the agreement that confirm our interpretation. Linear has emphasized paragraph 2.5 because that's the provision in which MPS agreed that in certain circumstances, it would not otherwise contest the validity of the patents in suit. But that was only in proceedings to enforce the consent order or this agreement. If linear's interpretation is correct, that's a null set. Because every infringement claim would be a claim to enforce the agreement. The exception has to have meaning. And in fact, you can look at the drafting history and it shows that MPS wanted that exception in there because it wasn't willing to give up its right to challenge the validity in any case. Let's also look at the last sentence of 3.3. It's the flip side of the preceding sentence. It says MPS agreed that products that have the accused ZX circuitry disabled as set forth in the ITC proceeding may be produced. That's the flip side of the preceding sentence. If you're using the ZX circuitry and they're connected so as to practice the claims, that's a problem. If it's disconnected, go ahead. They're flip sides of the same coin. Let's look at 6.1. Exactly parallels 3.3, provides the remedies. What does it cover? If you use the licensed product after the grace period, 1556. If you make 1557 through 59 at any time, the same. Or other products including ZX circuitry identified by counsel for linear in the ITC proceeding, connected so as to practice the asserted claims. It exactly parallels 3.3. The remedies in 6.1 parallel 3.3. Let me go to the extrinsic evidence for a minute. It seems that right up front you were acknowledging that in fact California law says it would be error to refuse to consider extrinsic evidence. Do you agree with that? You must consider it as a preliminary matter to see whether it reveals an ambiguity in the contract language. And Judge Sleet considered it. What he said was, I'm not going to allow ambiguities in the parole evidence to create an ambiguity in an otherwise clear written agreement. But you disagree with your opponent when he says that Judge Sleet actually just said, I'm not going to even look at it. No, he actually addressed it in a footnote. He said, I don't think the meaning is reasonably susceptible to that interpretation, so I'm not going to consider it in deciding whether to grant summary judgment. That's exactly what all the cases they cite, the Winnett versus Price. That's exactly what you're supposed to do. You consider it to see whether the agreement is reasonably susceptible to that interpretation. If not, it's out. All right, what about the fact that your witness changed his testimony? I mean, that's really not a good fact. And I see that you try to argue, well, it wasn't really a change. But I mean, he rewrote. I mean, it's as close to saying yes and then saying, oh, that was an error in the transcription should be noted. Let's take a look at JA 1175 to 77 because you'll actually see that the full polyclinic begins with a statement that Mr. Neely made four times in the deposition. He referred to, excuse me, I believe it's JA 1175 to 77. Let's start on 1175. This is the whole colloquy about this issue. It begins with his statement. This case was about four parts that MPS made, the 1556, which had been sold, and the 1557, 58, and 59 that had not been sold, and the fact that they contained the ZX circuitry as identified by counsel for linear in the ITC proceeding. That's the beginning of the colloquy. The next page he gets a follow-up question in which he's asked, well, can you testify today that Mr. England never told you that linear expected MPS to stop practicing the patents that were at suit in the ITC investigation? And when he answered that question, he didn't incorporate immediately what he had said literally seconds earlier. So when they saw the transcript, they corrected it. It wasn't inconsistent testimony. It was all part of the same set of testimony. Maybe we're getting into technical procedures, but that's not a correction of the transcript. I mean, you can try to explain the testimony, but you can't change the testimony once he's given it under oath. Well, I think he's allowed to make substantive corrections. In this case, he was clarifying it to be consistent with his previous testimony. But let me go back to the critical point. The question isn't whether the extrinsic evidence is ambiguous. The question is, does this create some sort of ambiguity in the text of 3.3 and the rest of the agreement? And we submit that it simply does not. You can't square their interpretation with the contract. It would render most of Section 3.3 superfluous. It's also contrary to the drafting history. Mr. Fried has not addressed the fact that Linear inserted a provision into the stipulation and consent order, a draft of it that said, MPS agrees, we won't practice the claims. MPS immediately, the same day, next draft, took it right out and said, we're not going to agree to that. Throughout the extrinsic evidence, from the beginning, from Mr. Shing's letter before the negotiations on the contract language to the very end, the very last day before the agreement was adopted, MPS made clear that we're only talking about this case with the ZS circuitry and the four accused products. So I just don't think it's a plausible reading. Let me ask you about the ZS circuitry. Is it your view that any change from what was identified in the ITC proceedings would be enough to take it outside the settlement agreement? It has to be the ZS circuitry identified by counsel for Linear in the ITC proceedings. So you say, well, there are 40 different components in this other circuitry. If there was only one different component, would you be outside the bounds of that settlement agreement? Let's take the 2104 as an example. The 2104 had the ZS circuitry disconnected, but it was still ZS circuitry identified by counsel in the ITC proceeding. If you actually go back into the ITC proceeding records, it's not in the record in this case. Two transistors were resized. The basic diagram is entirely the same. So it was the same ZS circuitry. So it needs to be the ZS circuitry identified by counsel for Linear in the ITC proceeding. You might have a good faith and fair dealing problem if you changed one minute little thing. But in terms of a literal breach of the agreement, no, it would need to be the ZS circuitry. But in any event, we're nowhere close to that here. It's conceded these are totally different designs. They were made by different design teams at different times. One's got eight components. One's got 40 components. They're nowhere close to each other. The language regarding the 2104 actually confirms my point. It says, for avoidance of doubt, Linear agrees that MPS products such as the MP2104 that have the accused ZS circuitry disabled as set forth in the ITC proceeding may be produced. And that's because the 2104 was ZS circuitry identified and originally accused in the ITC proceeding. They backed off because it was not connected. Now, would that product otherwise infringe the patent in the absence of the ZS circuitry? According to Linear, we disputed infringement, of course, so there was a settlement in which we did not admit liability. But that was their contention that it practiced the claims. But again, you just can't take the language, the ZS circuitry identified by counsel for Linear in the ITC proceeding and have it extend to any and all circuitry that might practice reverse polarity prevention. That's just not a reasonable reading. It's specific to what was at issue in the ITC proceeding. The circuitry at issue in this case was not at issue in the ITC proceeding. Do you want to trip a couple minutes to the attorney's piece? Yes. The first thing to recall about that is the standard of review, which is abuse of discretion. The district judge made three findings. First of all, who's the prevailing party? MPS was the prevailing party on the contract side. Linear was the prevailing party on the patent side. Not disputed. Second question, can you readily segregate the patent fees from the contract fees? His answer was no. They're inextricably intertwined based on the way Linear had presented the case. Again, that's not fairly disputed. In fact, I think if you look at JA-422, you'll see that Linear even conceded as much or effectively conceded as much in the record. If the invalidity claim can only apply to the infringement, why couldn't you segregate the fees that were used to develop and present the invalidity case? There were a couple of ways the district court could have gone about it. What he decided to do at stage three was to say, well, the contract fees and the patent fees are interrelated, but I don't want to award you all of it, even though you might be able to claim that under California law. I'm going to allocate all of the patent fees and take them off. He took out 50%. So that's the way he looked at it. The claims, I can't segregate the claims. Could he alternatively, perhaps it wouldn't have been an abuse of discretion, to try to pull out invalidity-related fees? He chose not to do so, and in fact it would have been quite difficult to do so. Why is that? Because there was a lot of interrelation among the fees. Can you find a few line items in the records? Yes, the district court had, by the way, all the fee records. What's your response to counsel's argument that basically the invalidity was the elephant in the room and that the infringement case was simple and short? No, well, actually the case actually involved uninfringement, invalidity, and inequitable conduct. Certainly up to claim construction, the claim construction issues applied to non-infringement and invalidity. Even after the claim construction, we had the same experts doing the analysis. As you know, if you've tried the patent cases, those arguments have to be related to each other. If the plaintiff takes too broad a view of infringement, it's going to run into invalidity problems. So the experts have to keep all that in line. Moreover, we had an inequitable conduct claim, and of course even before TheraSense, inequitable conduct was closely related to validity issues. So there wasn't any hermetic ceiling here, nor was it a case that was solely about obviousness. Infringement was tried. Inequitable conduct was tried. We lost them. We haven't appealed them because, frankly, the patent's going to expire in March, and it's not worth bringing the appeal. So the fact of the matter is the district judge was in the trenches. He heard the case. He had all the records before him. He knew how it was tried, and he determined that it didn't make sense to try to segregate out line item by line item and figure out which claim it went to. Instead, he said, we've got the contract, we've got the patent, they're intertwined, and I'm only going to give you half of it. We're not thrilled about it, they're not thrilled about it, but that's the way the cookie crumbles in the district court. It was not an abuse of discretion. So we ask you to vote. Thank you. Thank you. Okay. Mr. Freed. Mr. Freed, Your Honor, you said three things. One is, from the oral argument that you just heard, it's apparent what the error was with respect to the parole evidence. I think you heard an argument that said this judge decided that he didn't have to take into account the parole evidence in determining whether this language was reasonably susceptible. But that's exactly what the California cases say, that the reasonably susceptible determination must be predicated upon an evaluation of the parole evidence. And that's exactly the error the judge made. He just noted the parole evidence, noted its existence, and said, I don't need it because this is not reasonably susceptible. The California cases say you have to look at it. In fairness, I don't think that was the argument. What he said was that the judge looked at the parole evidence and found that the parole evidence was ambiguous. You can look at it, Your Honor. He did not. All he did was note it. If you read his opinion, the sole thing he says is linear relies on parole evidence. Then he moves on and says, this is not reasonably susceptible of that. He never did an evaluation of the parole evidence to determine whether it's reasonably susceptible. Had he done so, he would have seen the null set we've been arguing about all along. He would have seen the Neely stuff and all the rest of that stuff, but he didn't even talk about that stuff. Never even mentioned it. Never said a word about it in the connection with the evaluation of reasonably susceptible. On the attorney's case, did you propose a number to the trial judge? We proposed what was wrong with their number, and he never had any evaluation of it. He just took it up. But you didn't propose an alternative number? We didn't propose an alternative number because we wanted to get into the details of it, and he didn't want to get into the details of it. He just took the briefs, and that was it. What do you think a fair alternative number would have been? I think a fair alternative would have been to carve out the validity stuff, which the contract says we've given up our right to argue in the contract, and then the evaluation that he made, the 50 percent evaluation on what's left, I think would be perfectly within his discretion. Are you disputing the determination with respect to inequitable conduct and the fact that that's not excluded under the agreement? No, I'm not. I mean, I'm not saying anything about inequitable conduct. And we're reviewing the attorney's decision based on an abuse of discretion? I think that a non-exercise of discretion is a – well, yes, you're reviewing it on an abuse of discretion, but in the first instance, if he was legally not empowered to include the validity fees, he can only exercise his discretion on what he's legally empowered to exercise it on. We think the contract takes that out, takes it away from him, takes it away from his discretion. So, two other points. One on the ZX circuitry and this 20 versus 30 versus 50 or whatever it is, and this argument that these are totally different circuits. We shouldn't lose sight of the fact that ZX stands for zero-crossing. That's what it means, zero-crossing. And every one of these things has a zero-crossing comparator in it. They have ZX circuitry. That's how they get into sleep mode. That's how they do prevent reverse current. They do it with a ZX comparator, a zero-crossing comparator. So the rest of the circuitry may be different, but the critical portion of the circuitry is the same. On the issue of the other provisions of the agreement and who they support or don't they support, if you look at paragraph 6.1 and 3.3, and you look at page 36 of our blue brief, you will see the difference between those two paragraphs. The otherwise practiced language stayed in 3.3. It's not in 6.1. These are two different things. 6.1 merely was to make sure that when the 40% royalty applied, it wouldn't apply to the otherwise practiced stuff. That's why there's no otherwise practice there. Thanks. Thank you.